**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION**

| | |
|---|---|
| **BAR J-B CO., INC., AZTECA PETROLEUM, LLC, and AZTECA RS LLC** | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO. _____** |
| | ) |
| **TEXAS DEPARTMENT OF** | ) |
| **TRANSPORTATION and UNITED STATES** | ) |
| **ARMY CORPS OF ENGINEERS, and** | ) |
| **COLONEL CALVIN C. HUDSON II,** | ) |
| **DISTRICT COMMANDER, FORT WORTH** | ) |
| **DISTRICT, U.S. ARMY CORPS OF** | ) |
| **ENGINEERS** | ) |
| | ) |
| **Defendants.** | ) |

<u>**PLAINTIFFS' BRIEF IN SUPPORT OF APPLICATION AND MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION &
REQUEST FOR HEARING**</u>

Frederick W. Addison, III
Claire Carroll
Mark J. McMullen
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard Street, Suite 3800
Dallas, Texas 75201-6659
(214)855-7500 (Telephone)
(214)855-7584 (Facsimile)
Email: ccarroll@munsch.com
Email:  raddison@munsch.com
Email:  mmcmullen@munsch.com

**ATTORNEYS FOR PLAINTIFFS BAR
J-B CO., INC., AZTECA PETROLEUM,
LLC, and AZTECA RS LLC**

## TABLE OF CONTENTS

**Page(s)**

**TABLE OF CONTENTS** .................................................................................................. i

**TABLE OF AUTHORITIES** ........................................................................................... ii

**INTRODUCTION AND BACKGROUND FACTS** ......................................................1

    A.    The Parties and The Project ....................................................................................1

    B.    TxDOT, The Memorandum of Understanding ................................................3

    C.    Excavating Magnolia Oil Field ...........................................................................4

    D.    Waters of the U.S. ..................................................................................................5

    E.    Additional NEPA Impacts; the EA, Therefore, the EIS ...............................6

**STATUTORY BASES FOR RELIEF** .............................................................................9

**LEGAL STANDARD FOR INJUNCTIVE RELIEF** .................................................11

    A.    Likely Success on the Merits ............................................................................12

        1.    **TxDOT is violating NEPA** ...................................................................12

        2.    **TxDOT is violating the ESA** ..............................................................16

        3.    **Defendants are violating the CWA** ...................................................17

    B.    Plaintiffs are threatened with Imminent and Irreparable Harm ...................18

    C.    The Balance of Harms Weighs in Favor of Injunctive Relief ......................20

    D.    The Public Interest Will Be Served by Injunctive Relief .............................21

**PREEMPTIVE CONSIDERATIONS** .........................................................................21

**THE COURT SHOULD IMPOSE A MODEST BOND, IF ANY** ..........................24

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. Of Gambell, AK*,
    480 U.S. 531 (U.S. 1987)...................................................................................19

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................10, 24

*Davis v. Mineta*,
    302 F.3d 1104 (10th Cir. 2002) ........................................................................20

*Jones v. Bush*,
    122 F. Supp. 2d 713 (N.D. Tex. 2000) .............................................................12

*Lee v. Verizon Commc'ns Inc.*,
    2012 WL 6089041 (N.D. Tex. Dec. 7, 2012) ....................................................12

*Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Wright*,
    1993 WL 13044458 (N.D. Tex. June 15, 1993) ................................................11

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
    143 F.3d 800 (3d Cir. 1998)..............................................................................20

*Porter v. Warner Holding Company*,
    328 U.S. 395 (1946)...........................................................................................11

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*,
    826 F.3d 1030 (8th Cir. 2016) .....................................................................19, 24

*Sabine River Auth. v. U.S. Dep't of Interior*,
    951 F.2d 669 (5th Cir. 1992) ............................................................................22

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ..........................................................................18

*Sierra Club v. Froehlke*,
    359 F.Supp. 1289 (S.D. Tex. 1973), *rev'd on other grounds*, 499 F.2d 982
    (5th Cir. 1974).....................................................................................................24

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989) (Breyer, J.).................................................11, 18, 19

*Sierra Club v. U.S. Army Corps of Engineers*,
    446 F.3d 808 (8th Cir. 2006) ........................................................................10

*Sierra Club v. U.S. Army Corps of Engineers*,
    645 F.3d. 978 (8th Cir. 2011) ...................................................... *passim*

*Spiller v. White*,
    352 F.3d 235 (5th Cir. 2003) ...................................................................8, 10

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)........................................................................................20

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)...........................................................................................18

**Statutes**

5 U.S.C. § 702..................................................................................................10

16 U.S.C. § 1531–1544......................................................................................3

16 U.S.C. § 1536.........................................................................................16, 17

23 U.S.C. 327 ........................................................................................ *passim*

28 U.S.C. § 1361................................................................................................10

28 U.S.C. § 1651................................................................................................11

33 U.S.C. § 1251–1387.......................................................................................3

33 U.S.C. § 1344(a) ..........................................................................................17

42 U.S.C. § 4321..................................................................................................3

42 U.S.C. § 4332(C) ..........................................................................................13

Tex. Nat. Res. Code § 89.002 et seq. .................................................................5

Tex. Transp. Code § 201.6035....................................................................3, 12, 23

**Other Authorities**

23 C.F.R. § 771 .................................................................................................14

23 C.F.R. § 771.113(a).................................................................................11, 16

23 C.F.R. § 771.115 ...............................................................................13, 14, 15, 16

iii

33 C.F.R. § 325.8(b) ...........................................................................................................17

40 C.F.R., pt. 1500.1 - 1508.28 .........................................................................................13

40 C.F.R. § 1500.1(a) .........................................................................................................13

40 C.F.R. § 1500.1(b) .........................................................................................................13

40 C.F.R. § 1501.4 .........................................................................................................13, 15

40 C.F.R. § 1502.14(a) .......................................................................................................15

40 C.F.R. § 1506.1 .................................................................................................11, 14, 16

40 C.F.R. § 1508.9(a)(1) ....................................................................................................14

40 C.F.R. § 1508.18 ......................................................................................................9, 13

50 C.F.R. § 402.02 .............................................................................................................17

50 C.F.R. § 402.12(b)(2) ....................................................................................................16

50 C.F.R. § 402.14(a) .........................................................................................................16

16 Tex. Admin. Code § 314 .................................................................................................5

F.R.C.P. 10(c) ......................................................................................................................1

## PROLOGUE

It has been the long-held and laudable policy of the United States that before it approves, finances, regulates, or conducts certain activities that could potentially impact or harm the environment, necessary and mandatory assessments and reviews are to be conducted in order to preserve and protect the environment by regulating and minimizing man's impacts. Defendants Texas Department of Transportation ("TxDOT") and the United States Army Corps of Engineers (the "Corps") are acting in disregard of these principles; to the particularized detriment of Plaintiffs Bar J-B Co., Inc. ("Bar J-B"), Azteca Petroleum, LLC ("Azteca"), and Azteca RS LLC ("RS").

Plaintiffs are presently threatened with immediate, irreparable and significant harm because of the Defendants' efforts to approve, regulate, and construct a four-lane divided relief route for State Highway 31 in Navarro County, Texas (the "SH 31 Project") without adequately fulfilling their statutorily and contractually mandated responsibilities regarding the environmental impact of the SH 31 Project. The threat of harm to Plaintiffs is manifest; the necessity for a remedy is pressing; and there are no countervailing public policy or other considerations to justify delayed relief.

Plaintiffs therefore seek a Temporary Restraining Order and a Preliminary Injunction.

## I.    INTRODUCTION AND BACKGROUND FACTS[1]

### A.    The Parties and The Project

Plaintiffs Bar J-B and Azteca are the operators of record for the mineral estate of certain parcels located within what is known as the Magnolia Oil Field, where production first begin in

---

[1] A more detailed, annotated Statement of Facts can be found in ¶ 1 to 267 of the Original Complaint, incorporated herein by reference pursuant to F.R.C.P. 10(c).

approximately 1894. *See* Appendix in Support of Plaintiffs' Application and Motion for Temporary Restraining Order and Preliminary Injunction ("Appx."), p. 741 ¶¶ 3 – 4; Appx., pp. 524–25, ¶¶ 1–2. Plaintiff RS also owns real property interests in Navarro County, Texas as the owner of 100% of the working interest in certain oil and gas leases located within the Magnolia Oil Field. Appx., pp. 312–13 ¶¶ 1–2. The Magnolia Oil Field has been an area of continuous and uninterrupted exploration, development, and production of oil since 1894. Appx. p. 314 ¶ 6; Appx. p. 526 ¶ 6; Appx. p. 737 ¶ 6. Since the time oil was first discovered in the Magnolia Oil Field, the number of wells drilled, produced, and plugged and abandoned in the field, through which the proposed SH 31 Project right-of-way runs, totals into the hundreds. *Id.*[2]

TxDOT is constructing the SH 31 Project with a right-of-way that is planned to go through producing oil fields and encounter and impact <u>no less than</u> 64 oil wells. Appx. pp. 736¶ 4; Appx. p. 525 ¶ 3. The SH 31 Project I is already under construction. TxDOT contractors have already rerouted conduit on two Azteca leases: the Gillette Hill and Kerr Leases. Appx. p. 738 ¶ 9. Electrical conduit was buried approximately 15 feet deep on the Gillette Hill Lease right next to an active well and under flow lines Azteca uses for the lease. *Id.*

TxDOT's actual construction of the SH 31 Project right-of-way has not yet begun on Plaintiffs' properties, but TxDOT is exceedingly close. Currently, TxDOT has been building what appears to be an overpass ramp to and over Texas State Highway 287. *Id.* p. 738 ¶ 10. Once TxDOT's construction crosses over Texas State Highway 287, TxDOT will be on the Gibson Lease, another producing oil lease owned by Azteca. *Id.*

---

[2] A Texas Railroad Commission Map (indicating historical dense drilling activity) that was included within TxDOT's Estate Appraisal Report to Azteca and is also found in the Appendix shows the staggering number of oil wells in the area. Appx. p. 777.

2

**B.      TxDOT, The Memorandum of Understanding**

The United States Secretary of Transportation has the authority, under 23 U.S.C. § 327, to enter into a written agreement with a State, by which the Secretary of Transportation assigns and State Transportation Departments assume the Federal Highway Administration's (the "FHWA") National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. ("NEPA") responsibilities for a highway project.  23 U.S.C. § 327 also allows a State to assume additional FHWA responsibilities "for environmental review, consultation, or other action required under any Federal environmental law."

Pursuant to  23 U.S.C. § 327 and Tex. Transp. Code § 201.6035, TxDOT and the FHWA entered into a Memorandum of Understanding on December 16, 2014 (the "MOU") in which the FHWA assigned, and TxDOT assumed, the FHWA's environmental responsibilities for certain projects, including SH 31. Appx. pp. 1–24.

Most notably, but not exclusively, Section 3.1.1 of the MOU expressly provides TxDOT assumed all responsibility for compliance with the NEPA, "including compliance with statutory provisions, regulations, policies, and guidance related to the implementation of NEPA for Federal highway projects . . .." Appx. pp. 2–3.

In addition to assuming the FHWA's NEPA responsibilities, TxDOT assumed, pursuant to Section 3.2.1 of the MOU, all of the FHWA's "responsibilities for environmental review, reevaluation, consultation, or other action pertaining to the review or approval of [certain highway projects] required under . . ." other Federal environmental laws, including, but not limited to the Clean Water Act, 33 U.S.C. § 1251–1387 (the "CWA") (Sections 401, 402, 404, 408, and Section 319) and the Endangered Species Act of 1973, 16 U.S.C. § 1531–1544 (the "ESA"). Appx. pp. 4–5.

3

TxDOT purported to conduct the environmental review of the SH 31 Project as required under the MOU and applicable statutes. TxDOT issued the EA in December 2014 and included on its cover page: "[t]he environmental review, consultation, and other actions required by applicable Federal environmental laws for this project are being, or have been, carried-out by TxDOT pursuant to 23 U.S.C. 327 and [the MOU]." Appx. p. 25.

## C.    Excavating Magnolia Oil Field

TxDOT's construction of the SH 31 Project over and near oil wells is of concern to Plaintiffs because TxDOT's encountering and disturbing oil wells, whether producing, plugged and abandoned, or wells of unknown origin and condition will likely result in petroleum products and other toxic chemicals being released into the environment. Appx. p. 314 ¶ 7; Appx. p. 526 ¶ 7; Appx. pp. 737–38 ¶ 8.

TxDOT, has acknowledged the threats these oil wells pose stating at Page 40 of the December 2014 Environmental Assessment for the SH 31 Project (the "EA"):

> "Since toxic chemicals could be released should well caps be ruptured during construction, these wells are considered to be *high-risk sites*, with a *high potential for hazardous material or petroleum product contamination during construction*." (emphasis added).[3]

TxDOT determined additional study was required "because of the presence on these properties of oil wells, pipelines, discarded electrical transformers, strained soils, and soil sampling indicating concentrations of total petroleum and hydrocarbons exceeding the TRC Standards." Appx. p. 80.

TxDOT did not conduct any additional studies. Appx. pp. 314–315 ¶ 7; Appx. p. 526 ¶ 7. TxDOT, however, did state in the December 2014 Finding Of No Significant Impact for the SH

---

[3] Environmental Assessment for SH 31 Project, December 2014 (EA); p. 50, attached hereto beginning at Appx. p. 25.

4

31 Project (the "FONSI"), the "[a]pproximately 64 oil wells and/or injection/disposal wells with oil storage tanks and equipment . . . will be capped or relocated *prior to* commencement or construction activities." Appx.  p. 229 (emphasis added). As with its recommended additional studies, TxDOT has failed to follow its own requirements and has now begun construction of the SH 31 project without first capping and relocating all of the wells located within the SH 31 Project right-of-way.[4]

TxDOT's actions generate additional concerns because the expected contamination threatens and could negatively impact the surface waters and water quality of 40 plus streams and ponds that will already be impacted by the SH 31 Project, as well as threatened impacts to the soil, ground waters, and the endangered, threatened, and rare species and their habitats that are located within the geographic area of the SH 31 Project. Appx. pp. 316–317, ¶ 11–12.

## D.    Waters of the U.S.

The SH 31 Project would traverse numerous waters of the United States. TxDOT provides in the EA the SH 31 Project would cross approximately fifty-eight Waters of the United States at forty-four separate locations. Appx. pp. 58–62, Table 6.  TxDOT projects the SH 31 Project will result in 14.51 acres and 13, 712.4 linear feet of Waters of the United States being permanently impacted by the SH 31 Project. *Id.*  The impacts require the Corps to issue a "permit" before any person can discharge "dredge or fill" into those waterways. Appx. pp. 56–57.

The SH 31 Project also calls for no less than 26 bridges, many of them spanning waters of the United States. Appx. p. 45, Table 1. At least one bridge is 5,054 feet in length and at least

---

[4] TxDOT will find satisfying this requirement will be difficult.  Only the current operator or the Texas Railroad Commission ("TRC") are authorized to plug and abandon wells; TxDOT is neither.  TEX. NAT. RES. CODE § 89.002 et seq.; 16 TEX. ADMIN. CODE § 314.

seven other bridges are over one-quarter mile in length. *Id.* The total length of all of the proposed bridges for the SH 31 Project is 33,142 feet; over 6.27 miles of bridge construction. *Id.*

### E.    Additional NEPA Impacts; the EA, Therefore, the EIS

In addition to NEPA and CWA impacts, TxDOT came to the conclusion the SH 31 Project would potentially affect 10 threatened or endangered species or their habitats, Appx. p. 64, and recommended additional investigation into "two non-oil-well-related hazardous material sites that may pose a *substantial threat to human health or the environment* in the project study area." Appx. p. 80 (emphasis added).  No additional investigation of endangered species and their habitats, or the hazardous material sites has occurred.

Additionally, in an express acknowledgment TxDOT's environmental assessments were incomplete at the time TxDOT issued the EA, TxDOT stated it could not confirm the total amount of impacts to Waters of the United Stated because it was denied access "to some properties within the [right-of-way]; therefore not all water crossings were field verified and should be investigated and/or delineated once ROE is granted or when the properties are acquired." Appx. p. 56.  TxDOT also acknowledged the post-EA investigations were needed to "better measure the possible need for mitigation."  Appx. p. 57. There is no evidence TxDOT conducted any post-EA investigations, or ever proposed any mitigation plan to avoid or minimize all of the impacts to the Waters of the United States caused by the SH 31 Project. *See* Appx. p. 229 (FONSI issued two days after the effective date of the MOU under which the EA was performed without reference to any additional environmental documents).

Based on SH 31's four-lane profile, TxDOT concluded in the EA fifteen crossings for the SH 31 Project would require Individual Permitting from the Corps. Appx. pp. 56–57. TxDOT based its FONSI on the analysis of a four-lane highway and the need for Individual Permit

authorization for the SH 31 Project. Appx. p. 229.  The Environmental Management System Advance Planning and Development (AP&D) Stage Gate Checklist for the SH 31 Project dated March 3, 2015 (the "SH 31 AP&D") also states that the SH 31 Project would require both Nationwide Permit ("NWP") 14 and Individual Permit authorization. Appx. p. 231 ¶ 19b.  In the FONSI TxDOT specifically commits to obtaining Individual Permits for the SH 31 Project. However, the Corps has not issued, nor has TxDOT even sought, an Individual Permit for the SH 31 Project.

In the EA, TxDOT recommended additional study regarding the oil wells located with the SH 31 Project's proposed right-of-way because those wells are "*high-risk sites*, with a *high potential* for hazardous material or petroleum product contamination during construction." Appx. p. 80 (emphasis added).  The EA, however, does not provide any assessment or analysis of how or to what degree the "high potential" for hazardous material or petroleum contamination may impact or effect the environment, or how these impacts could or would be addressed in any way, avoided or minimized. *Id.*

After recognizing the high risk that the oil wells pose for a hazardous material leaks caused during the SH 31 Project's construction, TxDOT elected to forego additional studies or prepare an Environmental Impact Statement. Instead, TxDOT simply noted "[a]ny unanticipated hazardous materials and/or petroleum contamination encountered during construction would be handled according to applicable [laws]" without mention of any anticipated contamination associated with a "high-risk site" that has a "high potential" for such contamination. *Id.*  TxDOT, likewise, failed to include in the EA any explanation of how compliance with applicable laws, or any other mitigation measures that were absent from the EA, would render the adverse effects of a hazardous material contamination insignificant. *Id.*

7

As recognized by the Environmental Permits, Issues and Commitments (EPIC) form TxDOT completed for the SH 31 Project (the "SH 31 EPIC") (included at the end of the EA), TxDOT identified "Required Action" was needed in the following areas: (1) Stormwater Pollution Prevention Plan-Clean Water Act Section 402; (2) Cultural Resources; (3) Vegetation Resources; (4) Federal Listed, Proposed Threatened, Endangered Species, Critical Habitat, State Listed Species, Candidate Species And Migratory Birds Treaty Act; (5) and Hazardous Material or Contamination Issues. Appx. p. 228. Those actions were in addition to the need for NEPA compliance and NWP 14 and IP permits required for Section 404 of the CWA compliance. *Id.*

TxDOT confirms its need for additional environmental review in the SH 31 AP&D, TxDOT admits it has not addressed all of the "environmental requirements/commitments, etc. ..." for the SH 31 Project. Appx. p. 232 ¶ 54.

Despite acknowledging the SH 31 Project would likely have significant impacts on the environment and its own recommendations for additional studies and investigations, TxDOT issued a finding of no significant impact for the SH 31 Project two days after TxDOT and the FHWA entered in the MOU. Appx. p. 229. The FONSI states TxDOT made its determination to issue the FONSI based on a Final Environmental Assessment dated October 2014, two months prior to the effective date of the MOU and the EA. *Id.*

The FONSI doesn't even comport with what it is supposed to acknowledge. By issuing a finding of no significant impact, an agency is representing it has fulfilled its NEPA obligations. *See Spiller v. White*, 352 F.3d 235, 238 (5th Cir. 2003). The FONSI on its face admits TxDOT's NEPA obligations had not been fulfilled at that time and were still ongoing. Appx. p. 229. Specifically, the FONSI requires TxDOT acquire Nationwide and Individual Permits for the

8

Waters of the United States and conduct "[a]n intensive archaeological survey . . . for areas of the proposed [right-of-way] *previously not surveyed*." *Id.* (emphasis added).

Most notably for this action, the FONSI also required the oil wells located within the SH 31 Project right-of-way be "capped or relocated *prior to* commencement or construction activities." Appx. p. 229 (emphasis added). TxDOT has not abided by the terms of its own improperly issued FONSI.

Now, TxDOT is about to cross Texas State Highway 287 and if its construction of the SH 31 Project is not enjoined, TxDOT will encounter and impact numerous oil wells without a plan, or the authority, to plug and abandon the wells, or respond to the leaks, releases, and ruptures of which there is a "high potential," and without knowing the extent of the harms and impacts such contamination will have on the forty-four crossings of Waters of the United States, ten endangered or threatened species and their habitats in the SH 31 Project area, or any other environmental impacts and harms that petroleum contamination poses.

## II. STATUTORY BASES FOR RELIEF

Federal assistance, approval, regulation, conduct, and financing as the Defendants have granted or committed to provide here, constitute "major federal action" potentially affecting the environment. *See, e.g.,* 40 C.F.R. § 1508.18(a). TxDOT therefore has mandatory duties to conduct *pre-consent*, *pre-financing*, and *pre-activity* evaluations and consultations under NEPA and the ESA. *See e.g., Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d. 978, 996–97 (8th Cir. 2011).

Plaintiffs bring this action to compel the Defendants to engage in the appropriate consultations and environmental evaluations; and to restrain TxDOT from continuing

9

construction of the SH 31 Project until such time as those mandatory duties have been performed, and the requirements for defensible, final agency action have been satisfied.

Until such time, the Defendants' improvident action and inaction is expressly made actionable through the Administrative Procedures Act, 5 U.S.C. § 702 ("APA"), or in the alternative, Mandamus and Venue Act ("Mandamus Act"), 28 U.S.C. § 1361. Each of these statutory mandates creates "procedural protections" for persons such as Plaintiffs.

The "final agency" action trigger for such relief is present here, for several reasons. TxDOT, acting on behalf of FHWA, issued a FONSI based on grossly deficient and incomplete environmental review—thereby erroneously excusing any further environmental evaluations, including preparing an environmental impact statement. By issuing a FONSI, an agency not only acknowledges the action under review has no significant impact on the environment, but it is also an acknowledgment the agency has fulfilled its NEPA obligations, thereby constituting final agency action. *See Spiller v. White*, 352 F.3d 235, 238 (5th Cir. 2003) ); *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006).

There need not be—but certainly are additional grounds to find final agency action, because in addition to the regulatory trigger of issuing a FONSI; case authority provides the qualitative test that: "two conditions must be satisfied . . .: First, the action must mark the 'consummation' of the agency's decisionmaking process . . . And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow . . .'." *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). In this respect, it cannot be contested the Corps' issuance of only NWPs for the SH 31 Project also constitutes final agency action. It would be specious for Defendants to deny (through revisionist characterizations of the

sequence of events that has led to TxDOT beginning construction of the SH 31 Project) that final agency decision-making, with legal consequences, is precisely what has occurred here.

Still other regulatory and case law proscriptions have anticipated, only to forbid, Defendants' seemingly indifferent posture that will in actuality, actively "stream roll" Plaintiffs and circumvent the congressionally mandated system of pre-activity review. *See, e.g.*, 40 C.F.R. § 1506.1(a); 23 C.F.R. § 771.113(a); *Sierra Club v. Marsh*, 872 F.2d 497, 499–504 (1st Cir. 1989) (Breyer, J.) (applying the injunctive standard and holding an agency's procedural failings, i.e., "harm," that leads to later environmental impacts can constitute irreparable harm, because there otherwise would not be adequate means to stop "a bureaucratic steam roller, once started ....").

TxDOT is not free to exploit the Corps' or its own inaction—nor is this Court placed in the predicament of futility given the time that will elapse as a practical matter before this Court can adjudicate fully this dispute. Instead, pursuant to the All Writs Act (28 U.S.C. § 1651), or this Court's inherent powers, *see Porter v. Warner Holding Company*, 328 U.S. 395, 398 (1946), TxDOT should be precluded from continuing its illegal construction of the SH 31 Project that has been enabled only because, again, the Corps and TxDOT itself have failed to act in accordance with law; and which, if allowed, will undermine this Court's ability to resolve this matter in an orderly fashion.

## III.    LEGAL STANDARD FOR INJUNCTIVE RELIEF

To obtain a temporary restraining order ("TRO"), an applicant must show entitlement to a preliminary injunction. *See Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Wright*, 1993 WL 13044458, at *1 (N.D. Tex. June 15, 1993). A TRO is "simply a highly accelerated and temporary form of preliminary injunctive relief," and requires the party seeking such relief to

11

establish the same four elements for obtaining a preliminary injunction. *See Lee v. Verizon Commc'ns Inc.*, 2012 WL 6089041, at *1 n. 2 (N.D. Tex. Dec. 7, 2012) (quoting *Hassani v. Napolitano*, 2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009) (internal quotation marks omitted).

The relief Plaintiffs herein seek therefore overlaps, and is dependent upon the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the relief is not granted; (3) that the threatened harm outweighs any damage the relief might cause the opposing party; and (4) the relief will not disservice the public interest. *See, e.g. Jones v. Bush*, 122 F. Supp. 2d 713, 718 (N.D. Tex. 2000) (addressing preliminary injunction standard) (citing *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349, 1353 (N.D. Tex. 1991), *aff'd*, 948 F.2d 1286 (5th Cir. 1991) (per curiam).

For the reasons discussed herein, Plaintiffs satisfy their burden with respect to each element for injunctive relief as to each of the causes of action.

## A.    Likely Success on the Merits

Pursuant to the MOU, 23 U.S.C. § 327, and Tex. Transp. Code § 201.6035, TxDOT has committed to integrate NEPA, the CWA, and the ESA into its evaluative methods. Appx. p. 2–3 ¶¶ 3.1.1, 3.2.1. Despite its commitments and statutory and contractual mandates, TxDOT has failed to comply with its evaluative methods and objectives for the SH 31 Project.

### 1.    TxDOT is violating NEPA

NEPA mandates federal agencies must include in every recommendation for, or report on, "major federal actions" that may significantly affect the quality of the human environment, a detailed statement on:  (1) the environmental impact; (2) the adverse environmental effects which cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between

local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented.  *See* 42 U.S.C. § 4332(C).

Applicable regulations (found at 40 C.F.R., Part 1500.1 - 1508.28) provide NEPA mandates operate to "tell federal agencies what they *must* do to comply with the procedures and achieve the goals of NEPA."  40 C.F.R. § 1500.1(a) (emphasis added).  The regulations further specify "major federal action" mandating a NEPA evaluation are those "actions with effects that *may* be major and which are *potentially* subject to Federal control and responsibility."  40 C.F.R. § 1508.18 (emphasis added).

Federal approvals, regulations, and construction, such as TxDOT and the Corps' here, are "major federal action" that require compliance with NEPA, because such "actions" include those "new and continuing activities, including projects and programs entirely or *partly financed*, assisted, *conducted*, *regulated*, or *approved* by federal agencies . . . ."  40 C.F.R. § 1508.18(a) (emphasis added).  Indeed, even if "it is unclear whether a federal action will significantly affect the quality of the environment, the agency [still] should prepare an [initial] environmental assessment . . ." within the meaning of NEPA.  *Sierra Club*, 645 F.3d at 991.  Then, if in its preparation of an EA, an agency determines that the proposed federal action *may* significantly affect the environment, the agency must commence a "scoping" process as the initial step in preparation of a comprehensive EIS. *See* 40 C.F.R. § 1501.4; 23 C.F.R. § 771.115(a) (emphasis added).

TxDOT consequently is obligated, but has failed, to complete an EIS as part of its NEPA evaluation *before* it began construction on the SH 31 Project.  Lest there be any question on this issue, 40 C.F.R. § 1500.1(b) mandates: "NEPA procedures *must* insure that environmental

13

information is available to public officials and citizens *before* decisions are made and *before* actions are taken." (emphasis added). Moreover, although violated, here CEQ Regulations prohibit action that would adversely impact the environment or jeopardize the alternatives analysis prior to completion of the NEPA process. 40 C.F.R. § 1506.1.

TxDOT's EA fails to meet the requirements set out by NEPA and its implementing regulations because TxDOT failed to completely and sufficiently analyze SH 31 Project's environmental impacts and does not support TxDOT's conclusory finding that the project will not have significant environmental impacts in violation of 40 C.F.R. § 1508.9(a)(1).

TxDOT acknowledged throughout the EA the SH 31 Project will have significant impacts on the environment. Further, TxDOT concluded additional investigation or review was necessary on several environmental issues in the EA which effectively is an admission by TxDOT that an EIS should have been performed.

TxDOT's obligation to prepare an environmental impact statement is based on regulations as well as impacts. As part of the MOU, TxDOT must follow all FHWA regulations and guidance. Appx. pp. 2–3, § 3.1.1. As with all federal agencies, FHWA has promulgated its own regulations concerning NEPA compliance. *See*, generally 23 C.F.R. § 771. As a part of its regulations, FHWA addresses when it is appropriate to prepare an environmental impact statement, rather than an EA. At 23 C.F.R. § 771.115, FHWA regulations require an EIS for "actions that significantly affect the environment." TxDOT's EA admits the SH 31 Project significantly affects the environment, thus requiring an EIS. *See infra.*

Even more clear, in Section 771.115(a) FHWA "normally" requires an EIS when the project involves:

"a highway project of four or more lanes on a new location." 23 C.F.R. § 771.115(a).

14

TxDOT repeatedly describes the SH 31 Project as a four-lane highway on a new location.[5] TxDOT has admitted facts that under FHWA regulations required the preparation of an environmental impact statement, rather than an EA, from the outset. TxDOT has provided no explanation why the SH 31 Project falls outside the "normal" classifications used by FHWA for NEPA documentation. TxDOT acted in an arbitrary and capricious manner and contrary to law when it failed to prepare an EIS, ignored its own requirements and recommendations in the EA, and instead issued a FONSI, which on its face and in substance is in violation of 40 C.F.R. § 1501.4; 23 C.F.R. § 771.115(a).[6]

In addition, because TxDOT admitted it had incomplete information at the time it issued the EA and the FONSI, specifically incomplete information for the major environmental issues regarding CWA compliance, endangered species, cultural resources, hazardous waste sites and the "high-risk" oil wells to be encountered, it was impossible for TxDOT to perform an adequate alternatives analysis as required by NEPA and its implementing regulations. In its EA, TxDOT considered seven (7) alternatives including the No-Build Alternative.[7] Appx. pp. 39–43. The truncated alternative analysis performed by TxDOT was inadequate to satisfy the strict scrutiny and rigorous analysis required of alternatives. 40 C.F.R. § 1502.14(a). Of the six build (6) alternatives, only the Preferred Alternative [C in the EA] required encountering a producing oil field. Appx. pp. 39–43. The conclusion of selecting an alternative for the SH 31 Project that

---

[5] At p. 31 of the Appx., TxDOT writes: "the proposed Project is a four-lane divided relief route on new location." Similarly, in describing the SH 31 Project Alternative ultimately selected, and under analysis here, TxDOT writes: "alternative C would be a new location, four-lane, divided rural alignment . . . ." In describing the selection of the SH 31 Project preferred alternative (once again, the alternative under consideration here) TxDOT describes: "The proposed new location preferred alternative would be a four-lane grade separated, divided rural principle arterial . . . ."

[6] TxDOT's Guidance on Environmental Assessments also address the issue. When electing to prepare an EA on § 771.115(a) projects "normally" requiring an EIS. Appx. p. 750. Section 3.3 requires a "written justification" be prepared by TxDOT explaining why an EA, rather than an EIS should be prepared. *Id.*

[7] A review of the EA reveals the No-Build Alternative. The No-Build Alternative was not completely analyzed, only identified.

4853-0842-4026v.5

requires construction in a producing oil field, without analysis of environmental impacts associated with it, is not only the result of a failed alternatives analysis, but is also the result of irrational and unsupportable agency decisionmaking.[8]

Despite the CEQ's mandate for TxDOT to perform a comprehensive EIS upon the finding that the SH 31 Project would significantly affect the environment, and despite the nature and specifications for the SH 31 Project which required an EIS under Section 771.115(a), TxDOT, in arbitrary and capricious manner directly inconsistent with its own findings, and contrary to law, issued a FONSI.[9] Appx. p. 229.

Every day that TxDOT continues constructing the SH 31 Project it violates the preconstruction limitations of 40 C.F.R. § 1506.1 and prejudices a legitimate alternatives analysis. By TxDOT's own statements in the EA, the SH 31 Project is likely to have adverse environmental impacts. TxDOT continues to act arbitrarily and capriciously and contrary to law through its ongoing construction of the SH 31 Project in violation of 40 C.F.R. § 1506.1(a) and 23 C.F.R. § 771.113(a). Plaintiffs have a substantial likelihood of success on their NEPA claims.

**2.    TxDOT is violating the ESA**

The ESA requires a "procedural consultation" when any covered agency action *may* affect an endangered species. *See* 16 U.S.C. § 1536; 50 C.F.R. § 402.12(b)(2); 50 C.F.R. § 402.14(a). As part of this process, an agency, must consult with the United States Fish and Wildlife Service (the "FWS"), if it has reason to believe an endangered species or its habitat may be present in the area of a proposed action. *See* 16 U.S.C. § 1536(a)(2)–(4) and 1536(c)(1). For

---

[8] As set forth in detail in Section 217 to 222 of the Complaint, TxDOT did not satisfy the "hard look" requirement for its inquiry. The alternatives analysis fails for this, among other reasons.

[9] By issuing the FONSI, and expressly including within the FONSI, the stated need for additional investigation and actions, TxDOT identifies additional NEPA obligations had not been fulfilled at the time of issuing the FONSI, and should have performed an EIS.

purposes of the consultation, the "action area" is the area that is affected directly or *indirectly* by the proposed action. *See* 50 C.F.R. § 402.02. The agency must use the best available scientific data for decision-making. *See, e.g.,* 16 U.S.C. § 1536(a)(3) and 1536(c).

In the EA, TxDOT admits the habitats of at least ten (10) species on the Texas Conservation Action Plan's list of Species of Greatest Conservation Need are present within the SH 31 Project area. Appx. p. 64. TxDOT concludes there is no potential impacts – except to "the 10 aforementioned species." *Id.* Because of the presence of the ten species's habitats, TxDOT was obligated to consult with FWS and did not.

For reasons that mirror the above-discussed NEPA defects, TxDOT has not satisfied the NEPA based ESA consultation requirements, because TxDOT never consulted with the FWS regarding the ten endangered or threatened species and their habitats located within the SH 31 Project area before TxDOT started construction.

Plaintiffs consequentially should prevail on the merits of their ESA claim.

### 3.    <u>Defendants are violating the CWA</u>

Under the CWA, the "Secretary of the Army, acting through the Chief of Engineers'" is the federal officer charged with assessing whether to issue a "permit" "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The Secretary of the Army in turn has delegated responsibility for administering section 404 permitting to respective District Engineers of the Corps, *see* 33 C.F.R. § 325.8(b); here, Defendant Colonel Calvin C. Hudson.

Consequently, dredge and fill activities are only permissible if a person obtains the appropriate "dredge and fill" permit authorized by section 404 of the CWA. As noted above, TxDOT acknowledged numerous times in several environmental documents the SH 31 Project

crosses and permanently impacts numerous waters of the United States that require Individual Permits from the Corps. Specifically, TxDOT concludes in the FONSI that Individual Permits are required for the SH 31 Project. Appx. p. 229. TxDOT's FONSI requires an Individual Permit based on the impacts of a 4-lane road. *Id.* TxDOT's Nationwide Permit, however, is based on the impacts for a 2-lane road. Appx. p. 246. Moreover, the EA also demonstrates impacts greater than the 0.5 acre maximum allowed for use of Nationwide Permit 14. Appx. pp. 58–62, Table 6.

Notwithstanding that TxDOT has begun construction and intends to engage in activities that, pursuant to TxDOT's own statements in the EA and FONSI require Individual Permits, the Corps has not issued, and TxDOT has failed to even seek, an Individual Permit under Section 404 of the CWA. It was illegal and results in segmentation for TxDOT to submit an application for a CWA Permit based on a 2-lane highway when a 4-lane highway is planned and being constructed.

Plaintiffs consequentially should prevail on the merits of their CWA claim.

**B.    Plaintiffs are threatened with Imminent and Irreparable Harm**

Courts consistently have held federal agencies' failures to conduct required environmental and cultural evaluations *before* engaging in regulated conduct, infringes upon plaintiffs' "procedural" rights, and that infringement, in itself, rises to the level of "irreparable harm." *See, e.g., Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008); *Sierra Club*, 645 F.3d at 995; *Sierra Club*, 872 F.2d at 499-504 (Breyer, J.); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124-25 (9th Cir. 2005).

Plaintiffs' procedural rights are not, however, the only interests jeopardized by TxDOT's unauthorized activities that warrant injunctive relief. When procedural violations *actually* create a risk to the environment or a sensitive habitat or species (as is the case here), courts routinely

18

have held threats of the kind constitute irreparable harm. *See e.g. Sierra Club v. Marsh*, 872 F.2d 497, 499–504. Further, "[h]arm to the environment 'may be presumed when an agency fails to comply with the required NEPA procedure.'" *E.g. Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1037 (8th Cir. 2016) (citing *Sierra Club*, 645 F.3d at 978).

Plaintiffs' specific environmental interests will be harmed because Plaintiffs' use, operation and enjoyment of their properties will be negatively impacted by the environmental harms caused by TxDOT's construction of the SH 31 Project, specifically related to negative impacts to the Waters of the United States, endangered or threatened species and their habitats, surface waters, soil, and ground waters. *See* Appx. pp. 316–17, ¶ 11–14; Appx. pp. 527–29, ¶ 8–12; Appx. p. 744–45 ¶ 10–12. Plaintiffs will be irreparably harmed because their properties will be directly impacted by the SH 31 Project's construction, its scope, and size which will result in an interference with Plaintiffs' use and enjoyment of their properties. *See Sierra Club*, 645 F.3d at 995–96.

TxDOT's continued construction in light of its deficient environmental review regarding the impacts and harms of its constructing the SH 31 Project through an active oil field while disregarding its own imposed requirements to cap and relocate such oil wells prior to beginning construction impermissibly endangers both the environment at large and Plaintiffs' specific interests in the environment and their properties. As the Supreme Court of the United has noted "[e]nvironmental injury, by its nature can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., *irreparable*." *Amoco Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 545 (U.S. 1987) (emphasis added).

If the Defendants are not subject to a temporary restraining order and preliminary injunction as well as other appropriate equitable relief immediately; not only will Plaintiffs be denied (irreversibly) their procedural rights under NEPA, the CWA, and the ESA; there will be no meaningful way to undo the harm TxDOT either threatens or actually causes.

## C.    The Balance of Harms Weighs in Favor of Injunctive Relief

Plaintiffs seek conventional injunctive relief against the Defendants.    Accordingly, Defendants' purported "harm" is relevant in the balancing analysis—but inconsequential, because federal agencies hardly can claim undue hardship by a directive to perform statutory and regulatory required governmental functions.

TxDOT is likely to claim the harm it may suffer if enjoined is financial in nature.    Courts routinely have held (in several cases not withstanding quantification in tens-of-millions of dollars) pecuniary loss does not outweigh environmental damage and degradation caused by inadequate federal oversight.    *See, e.g.*, *Sierra Club*, 645 F.3d at 997; *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 166 (1978).    But in any event, the harm TxDOT may suffer is entirely "self-inflicted" for the reasons discussed herein—and should not operate to the detriment of Plaintiffs' rights. *Cf. Davis v. Mineta,* 302 F.3d 1104, 1116 (10th Cir. 2002) (finding the balance of harm justified injunctive relief because the "entities involved in this case have 'jumped the gun' on the environmental issues by entering into contractual obligations that anticipated a pro forma result. In this sense, the . . . defendants are largely responsible for their own harm."); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998) (holding that "[t]he self-inflicted nature of [defendant's] harm . . . weighs in favor of granting preliminary injunctive relief").

20

**D.     The Public Interest Will Be Served by Injunctive Relief**

The public interest will be best served by injunctive relief, because at its core, this case implicates agency obligations to fulfill legitimate governmental functions in the interest of protecting the public welfare.  *Cf. Sierra Club*, 645 F.3d at 997 ("just as important as the public interest in potential economic gains is 'the public's confidence that its government agencies act independently, thoroughly, and transparently when reviewing permit applications.").  Because Plaintiffs are seeking to enforce public interest statutes, injunctive relief is appropriate.

## IV.     PREEMPTIVE CONSIDERATIONS

In litigation of this kind, the agency defendants seeking to avoid the comprehensive scheme of regulatory oversight mandated by NEPA, the CWA, and the ESA routinely invoke a series of fairly predictable defensive positions.  For the Court's benefit, Plaintiffs anticipate and preemptively address several.

1)     <u>Bar J-B, Azteca, and RS have standing as Plaintiffs</u> – Bar J-B and Azteca are operators of record for oil wells that will be impacted by the SH 31 Project. Appx. pp. 525–27, ¶ 2–8; Appx. p. 741, ¶ 3–5. RS is a property owner in the form of a 100% working interest in certain oil and gas leases that will be impacted by the SH 31 Project. Appx. p. 313–15, ¶ 2–8.

As operators and a working interest owner, Plaintiffs have certain interests that TxDOT needs to acquire in order to proceed with the SH 31 Project. However, TxDOT will not acquire all of Bar J-B and Azteca's interests in the areas surrounding the SH 31 Project. Therefore, Bar J-B and Azteca will continue to be operators that will be impacted by not only by the taking of their property but also by the impacts during and after construction.  As such, Bar J-B, Azteca, and RS have a direct interest in the property and land on, and near, which TxDOT plans to construct the SH 31 Project. *See Sierra Club*, 645 F.3d at 995–96.

Plaintiffs have standing as the operators of and working interest owner for certain mineral estates whose property will be taken for and/or impacted by TxDOT's construction of the SH 31 Project. Further, Plaintiffs have standing to seek enforcement of their rights and avoid further injury caused by TxDOT's failure to prepare an EIS because:

> "[t]he procedural injury implicit in agency failure to prepare and EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project [such that they can] expect [ ] to suffer whatever environmental consequences the project may have."

*Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 674 (5th Cir. 1992) (quoting *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975)) (alterations in original).

Plaintiffs are specifically granted standing under § 1.1.5 of the MOU. Appx. p. 2.

Plaintiffs have demonstrated they will suffer from the loss of their procedural rights under NEPA, the ESA, and the CWA as well as from environmental consequences that will likely ensue from the SH 31 Project's construction without adequate environmental review. Appx. pp. 315–17, ¶ 8–14; Appx. pp. 527–29, ¶ 8–12; Appx. p. 742–45, ¶ 8–14. TxDOT and the Corps' failures to fulfill adequate environmental review dramatically increases the risks on substantial negative harms and impacts that construction of the SH 31 Project will have on water quality, surface and subsurface land, and endangered or threatened species and their habitats.

The risks and negative environmental impacts TxDOT has created due to its inadequate environmental review are injuries that clearly fall within the "zone of interests" that NEPA, the CWA, and the ESA seek to protect.

Further, Plaintiffs' injuries can be redressed by this Court through an injunction that prevents TxDOT from continuing construction of the SH 31 Project until TxDOT and the Corps have fulfilled their statutorily and contractually mandated environmental reviews in order to

22

address and assess the very injuries that Plaintiffs allege here and TxDOT has recognized in the EA and FONSI.

2)      <u>TxDOT is a proper defendant for this action</u> – TxDOT has expressly waived sovereign immunity and consented to Federal court jurisdiction for the claims brought regarding TxDOT's responsibilities under the MOU. Appx. p. 9, § 4.3.1; Tex. Transp. Code § 201.6035. TxDOT expressly agreed in Section 6.2.2 of the MOU to "defend all claims brought in connection with TxDOT's discharge of any responsibility assumed under th[e] MOU." Appx. p. 11.  Pursuant to Section 6.1.1 of the MOU and 23 U.S.C. § 327 (e), TxDOT is "solely liable and solely responsible for carrying out the responsibilities assumed under this MOU." Appx. p. 11.

This action stems from TxDOT's inadequate and arbitrary and capricious actions during its undertaking of the environmental review responsibilities for the SH 31 Project that TxDOT assumed pursuant to the MOU. Therefore, TxDOT is the appropriate defendant in this action.

3)      <u>This is not a suit to compel the Federal Defendants to enforce sanctions for regulatory violations</u> – The rights and protections under NEPA, the CWA, and the ESA inure to the benefit of Plaintiffs.  The remedy afforded by the APA (or Mandamus Act) further runs from Plaintiffs to the Defendants, and neither TxDOT nor the Corps can proceed without correcting its administrative failures.   The Court is empowered by the express terms of the APA and Mandamus Act to remedy the administrative failings—and otherwise enjoin TxDOT and the Corps.   Plaintiffs consequentially do not seek to compel any agency to act upon certain enforcement powers it may have to remedy violations of environmental and cultural mandates— and indeed takes no position on whether the Defendants should do so.  Plaintiffs are entitled, and herein invoke, their right of judicial review and to seek equitable relief.

23

4)    "Citizen suit" remedies under the ESA are legally distinct from APA relief Plaintiffs are entitled to – The APA expressly grants persons situated such as Plaintiffs, a remedy for agency inaction or misguided action like that at issue here.  For that reason, Plaintiffs are not required to seek relief under the Citizen Suit Provisions of the CWA or the ESA.  The United States Supreme Court flatly has rejected the notion a citizen suit must be brought when the United States' conduct triggers an APA cause of action.  *See Bennett*, 520 U.S. at 175-77.

5)    The APA places no administrative "exhaustion" duties on Plaintiffs – TxDOT and the Corps are the parties subject to administrative mandates.  That notwithstanding—a common practice of defendants is to imply some burden runs to persons situated such as Plaintiffs to invoke the administrative process.  The APA contains no such precondition.  The FONSI represents final agency action and this suit is, therefore, ripe.

## V.    THE COURT SHOULD IMPOSE A MODEST BOND, IF ANY

Plaintiffs bring this action not only for their own protection and benefit, but for the protection and benefit of the public at large for the harms and injuries that will or may be caused by the continued construction of the SH 31 Project without adequate NEPA environmental review. In light of the important public interest in the enforcement of NEPA, courts have held the bond requirement may be waived or only a nominal bond may be required when a plaintiff seeks a temporary restraining order or preliminary injunction pursuant to NEPA violations. *See Richland/Wilkin Joint Powers Authority v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citing *Davis*, 302 F.3d at 1126 ; *Monarch Chem. Works, Inc. v. Exon*, 452 F.Supp. 493, 503 (D. Neb. 1978), aff'd, 604 F.2d 1083 (8th Cir. 1979); and *Landwatch v. Connaughton*, 905 F.Supp.2d 1192, 1198 (D. Or. 2012)); *Sierra Club v. Froehlke*, 359 F.Supp. 1289, 1386 (S.D. Tex. 1973), *rev'd on other grounds*, 499 F.2d 982 (5th Cir. 1974) (ordering

24

plaintiffs seeking injunction based on NEPA violations to post $100.00 bond).  Plaintiffs respectfully submit, a nominal or modest bond is warranted in this case.

March 12th, 2018                                  Respectfully submitted,

                                       /s/ Frederick W. Addison, III
                                       Frederick W. Addison, III
State Bar No. 00903350
Claire Carroll
State Bar No.  24092224
Mark J. McMullen
State Bar No.  24106288
500 North Akard Street, Suite 3800
Dallas, Texas 75201-6659
(214)855-7500 (Telephone)
(214)855-7584 (Facsimile)
Email: ccarroll@munsch.com
Email:  raddison@munsch.com
Email:  mmcmullen@munsch.com

**ATTORNEYS FOR PLAINTIFFS BAR J-B CO., INC., AZTECA PETROLEUM, LLC, and AZTECA RS LLC**

## CERTIFICATE

Prior to filing this Brief in Support, on 12th day of March, 2018, Plaintiffs furnished by electronic means a copy of the Complaint, Application, and Brief in Support (along with all supporting materials) to counsel for the State in the underlying condemnation action, Thornton, Wood, Esq.  Plaintiffs also furnished a copy of the same pleadings furnished to Mr. Woods to Randall C. Merchant, counsel for the U.S. Army Corps of Engineers.  These copies were provided as courtesy copies and not for purposes of service.

                                       /s/ Frederick W. Addison, III
                                       Frederick W. Addison, III